**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

               v.

BASILIO HERNANDEZ,

               Defendant.

**REPORT AND
RECOMMENDATION**
18-cr-6126-FPG-JWF

### Introduction

In a four-count indictment dated August 21, 2018, the government charged defendant Basilio Hernandez ("the defendant" or "Hernandez") with narcotics conspiracy, possession of fentanyl and heroin with intent to distribute, possession of heroin with intent to distribute, and possession of cocaine with intent to distribute, all in violation of Titles 18 and 21 of the United States Code. Docket # 22.

Currently before the Court are the defendant's omnibus motions filed on October 29, 2018.[1]  Docket # 31.  The government responded to Hernandez's motions on November 16, 2018 (Docket # 32).  The Court held oral argument on November 29, 2018, at which the Court resolved several of the defendant's motions (Docket ## 34-36).  The Court reserved decision on the motions to suppress and held an evidentiary hearing on January 23, 2019.  Docket # 37. The government filed its post-hearing brief on March 20, 2019

---

[1] By Text Order of Chief Judge Frank P. Geraci, dated August 21, 2018, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B).  Docket # 23.

(Docket # 42).   Hernandez responded on March 25, 2019 (Docket # 44), and the government replied on April 2, 2019 (Docket # 46).

The following is my Report and Recommendation as to the defendant's remaining motions to suppress statements and evidence.

### Relevant Facts

Unlike many suppression motions, the relevant facts here are largely not in dispute.   On September 21, 2017, Rochester Police Department ("RPD") Investigators David Swain and Joseph Briganti received information from a confidential informant that several Hispanic males had packaged heroin and cocaine inside 41 Geneva Street.[2]  Docket # 1, at ¶ 5.  The confidential informant reported that he had observed a Hispanic female place drugs in the trunk of a white BMW that was parked and covered with a tarp in the driveway of 35 Geneva Street.   The informant also provided the Vehicle Identification Number ("VIN") of the white BMW in question.   Id.

At approximately 11:00 a.m. that day, RPD Officer Nicholas Thomas responded to the Geneva Street address to investigate further and saw a white BMW parked in the back of the single-lane driveway.   The BMW was partially covered by a tarp.   Id. at ¶ 6.  There were also several other vehicles parked behind the BMW.  Officer Thomas observed that the white BMW did not have any license plates.   Officer Thomas, who did not have a warrant or other legal

---

[2] The affidavit in support of the search warrant simply states that the men were packaging "inside a location on Geneva Street."   Docket # 32, Ex. A (Docket # 32-1) at 6.

authorization, decided to walk on to the property and inspect the BMW. Seeking to confirm the veracity of the confidential informant, Officer Thomas removed the tarp from the BMW so he could view the bottom left corner of the windshield where he knew the VIN plate was affixed to the interior of the car. Government's Resp. (Docket # 32), at 2.

United States Border Patrol Agent Chris Farnher also responded with his K-9 partner "Pistol," who is trained to detect the odor of narcotics. Id. Without obtaining a warrant, Agent Farnher and Pistol entered the backyard of 35 Geneva Street and conducted a sweep of the driveway on the side of 35 Geneva Street. Id. While doing so, Pistol alerted to the right rear corner of the white BMW for the presence of narcotics. Id.

Officer Thomas remained at 35 Geneva Street while other officers left to seek a search warrant to allow law enforcement to search and seize the white BMW. While the search warrant was being sought, Officer Thomas approached the front porch of 35 Geneva Street and spoke with the defendant who was sitting on his front porch. Id. at 2-3. Officer Thomas was wearing a body camera. The body camera footage[3] confirms that Hernandez identified himself to Officer Thomas and told him that he lived at 35 Geneva Street. In response to Officer Thomas's questions, Hernandez stated that

---

[3] Pursuant to the agreement of the parties, the Court reviewed this body camera footage in camera.

the white BMW belonged to him.  He also stated that the 1990 Toyota parked in the driveway behind the BMW was his, but the other two vehicles parked in the driveway – a 1999 Chevrolet Tahoe and a 2000 Volkswagen Beetle – belonged to his girlfriend.  Id. at 2-3. Officer Thomas asked that Hernandez move these other vehicles so that law enforcement could tow the BMW.  During their encounter, Officer Thomas was standing several feet from the defendant, who was sitting on the porch steps.

Meanwhile, based on the information from the confidential informant and the alert of the K-9 to the outside of the white BMW, Monroe County Court Judge Vincent Dinolfo signed a warrant authorizing the search and seizure of the white BMW parked in the driveway.  See Docket # 32-1.  The vehicle was eventually towed to the police station where, upon search of the trunk, the police discovered a large quantity of drugs and narcotics paraphernalia. Docket # 32, at 3.  Thereafter, Hernandez was taken into custody and questioned by Investigators Swain and Briganti.  After being advised of his Miranda rights, the defendant again admitted that he owned the white BMW but denied any knowledge of the narcotics found in the car.  Id.

## Discussion

I.  Motion to Suppress Search of BMW:  Hernandez argues that looking under the tarp and the canine sniff of his car were both warrantless searches conducted by law enforcement in clear

violation of his Fourth Amendment rights.  Therefore, "[l]acking both confirmation of the identity of the vehicle by VIN, and the results of the K9 search, the search warrant for the vehicle would lack the necessary corroboration and probable cause to be legal." See Def.'s Post-Hr'g Mem. of Law (Docket # 44), at 15.  For the reasons that follow, I agree in part.

A. The Supreme Court's Decision in Collins v. Virginia: In their post-hearing briefs both the government and the defendant acknowledge the significance of the Supreme Court's recent decision in Collins v. Virginia, __ U.S. __, 138 S. Ct. 1663 (2018) to Hernandez's motion to suppress.  In Collins, police spotted on the social media website Facebook a photograph of a particular motorcycle they believed to be stolen.  Law enforcement officers were able to determine the location depicted in the photograph and an officer was sent to the location to investigate.  Upon arrival, the officer was able to observe from the street a motorcycle parked on the driveway and covered by a white tarp.  The investigating officer, who did not have a search warrant, walked up the driveway towards the house and the covered motorcycle.  After reaching the motorcycle, the officer lifted the tarp off in order to obtain the VIN and license plate numbers so as to confirm that it was the motorcycle he was looking for.  After taking a picture of the motorcycle, the officer replaced the tarp and went back to his patrol car to wait for the suspect to return home so he could

arrest him.  The suspect, Ryan Collins, was arrested, charged with receiving stolen property, and made a pretrial motion to suppress the evidence that was "obtained as a result of the warrantless search of the motorcycle." Id. at 1669.  Collins argued that law enforcement violated his Fourth Amendment rights by trespassing on the curtilage of his house to conduct a criminal investigation. The trial court denied the suppression motion and Collins was convicted.  On appeal, the Supreme Court of Virginia upheld the conviction finding that the warrantless search of the motorcycle was justified under Fourth Amendment's automobile exception. Id.

The Supreme Court reversed.  In an opinion written by Justice Sotomayor, the Court held that by "physically intruding on the curtilage of Collins' home to search the motorcycle," the investigating officer "not only invaded Collins' Fourth Amendment interest in the item searched, i.e., the motorcycle, but also invaded Collins' Fourth Amendment interest in the curtilage of his home." Id. at 1671.  Because "the Court considers curtilage – the area immediately surrounding and associated with the home – to be part of the home itself for Fourth Amendment purposes," when a law enforcement officer intrudes on curtilage to gather evidence, "such conduct is presumptively unreasonable absent a warrant." Id. at 1670 (internal quotation and citation omitted).

Given the remarkable similarity between the conduct of law enforcement in Collins and the facts presented here, it is no

surprise that Hernandez argues that this case "resembles Collins v. Virginia at its core." See Docket # 44, at 8. For its part, the government does not seriously dispute that if the location where the covered BMW was parked constituted curtilage of 35 Geneva Street, it would have a difficult time arguing the inapplicability of the Supreme Court's decision in Collins. Instead, the government claims Collins is not controlling because in this case there is "a factual issue of whether or not the driveway constituted curtilage because the driveway appeared to be a shared driveway or common area of 35 and 37 Geneva Street." See Government's Post-Hr'g Mem. of Law (Docket # 42), at 2. If Hernandez shared the driveway with his neighbor, the government argues, then the driveway where the BMW was parked "was a common area and the defendant had no reasonable expectation of privacy in the driveway." Id. at 7; see United States v. Jones, 893 F.3d 66, 72 (2d Cir. 2018) (Collins not controlling in situation where car subjected to warrantless search was parked in a driveway shared by tenants of two multi-family buildings and was not within curtilage of defendant's private home). The Court granted the government's request for a hearing to provide proof that the driveway was a common area where the defendant had no expectation of privacy.

B. Resolving the Curtilage Issue: The Fourth Amendment "certainly does not permit an officer physically to intrude on curtilage, remove a tarp to reveal license plate and vehicle

identification numbers, and use those numbers to confirm that the defendant committed a crime." Collins, 138 S. Ct. at 1673, n.3. Recognizing this, the government has wisely conceded that when Investigator Swain lifted the tarp off the BMW to reveal the car's VIN, he was conducting an illegal warrantless search and accordingly identification of the BMW's VIN number "should be excluded from the warrant and the Court's review of the warrant." See Jan. 23, 2019 Hr'g Tr., Docket # 39 ("Tr."), at 51.    Thus, what remains to be determined is whether the defendant's Fourth Amendment rights were violated when law enforcement brought a drug detection dog onto the property to sniff the BMW.    The government argues that Hernandez's Fourth Amendment rights were not violated because the driveway where the BMW was parked was not curtilage, but rather was a common area in which the defendant had no expectation of privacy.

In support of their "common area" argument, the government relied on the testimony of Cheryl Ann Hurley ("Hurley"), a real estate broker and property manager.    Hurley testified that she and her team manage approximately 140 different properties in the Rochester area, including 35 Geneva Street.    As the property manager of 35 Geneva Street since 2007, she knew Hernandez to be the legal tenant of that residence.    Tr. at 12-15.

Hurley testified that 35 Geneva Street is one side of a duplex on a dead-end street[4] consisting of two separate house numbers when viewed from the road: 35 Geneva on the right side and 37 Geneva Street on the left side.  Tr. at 14, 40.  The duplex has one single-car driveway ("the driveway") located on the right-side of the duplex; in other words, on the side of the house where Hernandez lived.  Tr. at 14, 30.  The tenant on the other side of the duplex, 37 Geneva Street, was Gladys Skellen, a woman in her 90s who did not drive, own a vehicle, or otherwise use the driveway at any time.  Tr. at 16.  Ms. Skellen never requested to use the driveway, and the door to her side of the duplex did not abut, or provide access to, the driveway.  Tr. at 39-40.

Hurley explained that both Hernandez and Skellen were leasing their respective apartments on a month-to-month basis at the time of the defendant's arrest.  Tr. at 20.  The door from the side of the house Hernandez rented opened directly onto the driveway.  Tr. at 36-37.  The driveway was not "open to the public" and it was always Hurley's understanding that the driveway on this side of the duplex was part of the defendant's residence.  Tr. at 33-35. Indeed, given the location of the driveway and the fact that it was historically used exclusively by the tenant of 35 Geneva

---

[4] Hurley confirmed that the house on Geneva Street closest to the dead-end has its driveway on the right side of that house, suggesting that the driveways for the remaining homes on Geneva Street may likewise follow the same pattern.  Tr. at 40-41.

Street, Hurley testified that Hernandez could "assume that that was his driveway." Tr. at 32. Since Hernandez moved in, Hurley was not aware of anyone else but the defendant using the driveway. Tr. at 33. Hernandez kept several cars in the driveway and Hurley testified that if Hernandez ever complained that someone other than Hernandez or a guest of his parked in the driveway, she would have to "come out and go talk to whoever is parking in the driveway, [sic] that they shouldn't be there." Tr. at 33.

The Supreme Court has recognized that the "very core" of the Fourth Amendment is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). The "area adjacent to the home and to which the activity of home life extends," known as curtilage, is afforded the same protection against unreasonable searches. Florida v. Jardines, 569 U.S. 1, 7 (2013) (internal quotation marks omitted). Warrantless searches within a home's curtilage violate the Fourth Amendment. Harris v. O'Hare, 770 F.3d 224, 240 (2d Cir. 2014). Based on the hearing evidence, the Court finds that that the area where the covered BMW was parked was protected curtilage of 35 Geneva Street.

First, nothing the government presented at the hearing would suggest that the area where the defendant's BMW was parked was a "common area" shared with either the public or the tenant of 37 Geneva Street. The BMW was stored directly in front of the side

entrance to the defendant's residence, not an area that would typically be "shared" or utilized by the tenant residing on the opposite side of the dwelling.  Indeed, given the layout of the duplex and the access points to the driveway, as well as the fact that the driveway had always been used exclusively by Hernandez, the property manager testified it would be reasonable for the defendant to believe the driveway area was exclusively his. Second, the manner in which Hernandez stored the BMW was a clear indication that he intended that access to the vehicle be restricted.  By covering the entire vehicle with a tarp, Hernandez took efforts to assert his privacy interests to not only the public, but to his neighbors.  That the government concedes the lifting of the tarp would qualify as an illegal search only confirms that Hernandez had a reasonable expectation of privacy in both the BMW and the location where it was parked.

Finally, the government seems to argue that because Hernandez lived in a small duplex, he essentially forfeited his right to privacy in all areas surrounding his home.  The fact that Hernandez lived in a small duplex does not eliminate the concept of curtilage.  In this case, the duplex was a single house that had been divided into two separate residences, each with its own living space, independent entrances, and with different house numbers.  I disagree with the government that when it comes to defining curtilage, a small duplex and a multi-unit apartment building are

interchangeable under the Fourth Amendment. A tenant in a small duplex certainly has a greater expectation of privacy in curtilage areas of the home than a resident of a multi-family apartment building. A location on a single-lane driveway that abuts a secondary side entrance belonging to a specific tenant of the duplex is not the curtilage equivalent of a shared parking area where multiple tenants of a multi-family apartment complex park their vehicles. After reviewing the photographs introduced at the hearing and the body camera video, the particular area at the side of the defendant's home where Hernandez stored his covered BMW was an area where (1) the "intimate activit[ies] associated with the sanctity of a man's home and the privacies of life" would ordinarily be conducted and (2) was an area near his home where Hernandez had (and actually manifested) a legitimate and reasonable expectation of privacy. See United States v. Titemore, 437 F.3d 251, 258 (2d Cir. 2006) (quoting United States v. Dunn, 480 U.S. 294 300 (1987)).

To be sure, the law recognizes that visitors, including members of law enforcement, have an implied license to walk upon a home's curtilage to knock on a door or engage the resident in a consensual conversation. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Jardines, 569 U.S. at 8 (quoting Kentucky v. King, 563 U.S. 452, 470 (2011)).

But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

Jardines, 569 U.S. at 9 (emphasis in original).

For these reasons, I find that (1) the location on the driveway at the side of the house where the covered BMW was parked was part of the curtilage of 35 Geneva Street and (2) the use of a trained police narcotic detection dog to sniff the outside portions of the BMW was an unlawful warrantless search of the defendant's vehicle.

C.  Alternative Theory:  In an argument limited to a single sentence in their memorandum of law, the government asserts an alternative theory opposing suppression: "The government submits that even without information about the canine sniff, there is probable cause to support the warrant because the warrant is also based upon information provided by a confidential source."  See Docket # 42, at 10 (emphasis added).

13

The task of a judge reviewing a search warrant application is
"to make a practical, commonsense decision whether, given all the
circumstances set forth in the affidavit before him, <u>including the
'veracity' and 'basis of knowledge' of persons supplying hearsay
information</u>, there is a fair probability that contraband or
evidence of a crime will be found in a particular place." <u>Illinois
v. Gates</u>, 462 U.S. 213, 238 (1983) (emphasis added).  To properly
evaluate the government's alternative argument, the Court must not
only set aside the "canine sniff" from the warrant application but
also the discovery of the VIN which, as the government concedes
(Tr. at 51), was the fruit of an illegal peek under the tarp
covering the BMW.  However, these two pieces of evidence provided
facts crucial to believing the confidential informant ("CI") "that
evidence of a crime will be found in a particular place."  As the
application makes clear, all of the facts supporting probable cause
were provided by the informant: "The CI stated that during the
early morning hours of September 21, 2017 he/she observed an [sic]
Hispanic female take the packages of Heroin and place them in the
trunk of the 1992 BMW, white in color, bearing no New York
Registration, with Vehicle Identification Number of
WBAHD6313NBJ68299." <u>See</u> Docket # 32-1, at 6.  It was reasonable
and logical for the issuing judge to believe the assertion that
the CI personally observed drugs being placed in the trunk of the
BMW because (1) the CI described the vehicle, including an unusual

detail - the BMW's actual VIN number - that "matched" what Investigator Swain found when he lifted the tarp off the BMW and (2) law enforcement utilized a drug detection dog to conduct a sniff search of the vehicle and the canine "did positively indicate an odor of a controlled substance on the area of the right rear trunk." Id.

What the government is suggesting then is even if law enforcement had not corroborated the information provided by the CI, the search warrant for the BMW signed by Judge Dinolfo would still be supported by probable cause. In support of their alternative theory, the government cites United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000). But Canfield is not particularly helpful because it deals with a motion to suppress evidence based on a claim that the "affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information" pursuant to Franks v. Delaware, 438 U.S. 154, 164-72 (1978). Hernandez has not made a Franks claim in his suppression motion. Rather, the issue here is whether the search warrant was supported by probable cause absent any corroboration of the accuracy of the incriminating information provided by the CI.

It may be that the government intended to invoke the "independent source doctrine."

15

> The independent source doctrine permits the admission of otherwise excludable evidence where law enforcement officers obtain a valid search warrant based on "sources [that are] wholly unconnected with the [unlawful] entry and [were] known to the agents well before the[ir] initial entry." Segura v. United States, 468 U.S. 796, 814 (1984). To demonstrate its entitlement to this exception, the government must show that "(1) the warrant . . . [is] supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct." United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993).

United States v. Bonczek, 391 F. App'x 21, 24 (2d Cir. 2010). If this is indeed the basis for the government's alternative argument, it must demonstrate that (1) the actions by law enforcement to corroborate the CI (lifting the tarp to confirm the BMW's VIN and utilizing a drug detection dog) were not necessary to the probable cause finding and (2) the police would have sought and obtained a warrant "even without the information confirmed by the illegal entry." Id. If this is the government's theory, a fact-finding hearing may be required.

It is not fair to the defendant for the Court to try to divine exactly what alternative theory the government is asserting. For this reason, the Court directs the government to file a brief detailing the factual and legal basis for the alternative argument raised at page ten of its post-hearing brief. The government shall file its brief no later than two weeks after entry of this Report and Recommendation and the defendant shall have two weeks

thereafter to respond. Once these briefs have been filed, the Court will provide further direction on this remaining issue.

II.    Motion to Suppress Statements:    Hernandez seeks to suppress statements he made to law enforcement before he was read his Miranda rights while he was sitting on his porch on the morning of September 21, 2017. He asserts that when he made these statements it was "clear a reasonable person would not feel 'free to leave' in a similar situation." See Docket # 44, at 14. The parties agreed that an evidentiary hearing on the suppression of statements was unnecessary and stipulated that the Court could determine whether the defendant made the statements during a custodial interrogation by reviewing the body-worn camera footage. After reviewing the video, the Court finds that the statements Hernandez made to Officer Thomas were not the product of a custodial interrogation.

It is well-settled that police may not interrogate a suspect who has been taken into custody without first advising him of his Miranda rights. United State v. Newton, 369 F.3d 659, 668 (2d Cir. 2004). However, it is only in the context of a custodial interrogation that a defendant is entitled to be informed of his Miranda rights. Dickerson v. United States, 530 U.S. 428, 434-35 (2000); Tankleff v. Senkowski, 135 F.3d 235, 242-43 (2d Cir. 1998).

In determining custodial status, the test is "whether a reasonable person would have understood herself to be subjected to

restraints comparable to those associated with a formal arrest," and whether there were any "affirmative indications that the defendant was not free to leave." United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir. 1995) (internal citation and quotations omitted). An actual arrest is not a prerequisite for an accused to be "in custody." Rather, it is sufficient "when law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." United States v. Badmus, 325 F.3d 133, 138 (2d Cir. 2003) (citation and quotations omitted); see United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969) ("[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.").

After considering the totality of the circumstances surrounding the questioning of the defendant on September 21, 2017, I conclude that Hernandez was not in custody at the time he made his statements to law enforcement officers. To the contrary, I find that a reasonable person in the defendant's situation would have thought he was free to leave or end the questioning. The body camera footage confirms that Hernandez was sitting on his front porch during the questioning. Miranda's "in custody" requirement can be satisfied if the questioning was "conducted in

custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987), abrogated on other grounds by United States v. FNU LNU, 653 F.3d 144 (2d Cir. 2011). There is a difference between being questioned inside a police station as opposed to inside one's home. See Newton, 369 F.3d at 675 ("[I]nterrogation in the familiar surroundings of one's own home is generally not deemed custodial."). The front porch of one's home has been held to be an inherently familiar and non-coercive environment. See, e.g., Titemore, 437 F.3d at 260 (Miranda warnings not required where defendant was asked to step outside and was questioned on his front porch); United States v. Mitchell, 966 F.2d 92, 99 (2d Cir. 1992) (finding that Miranda warnings were not required where interview occurred in the familiar surroundings of the front porch of the defendant's home); United States v. Herman, No. 07-CR-6088L, 2008 WL 2553232, at *3 (W.D.N.Y. June 25, 2008) (defendant was not subjected to custodial interrogation when he was approached and questioned by law enforcement while sitting on his front porch). Here, law enforcement never touched Hernandez, displayed their weapons, engaged in any coercive or threatening actions, or used any threatening language. The defendant was never restrained, threatened with arrest, taken into custody, or told that he was not free to leave. Law enforcement never attempted to block or

restrict the defendant's movement from the porch or prevent him from retreating into his home. In sum, the stipulated evidence submitted to the Court confirms that Hernandez was never subjected to custodial interrogation while being questioned on his front porch. Accordingly, his <u>Miranda</u> rights were not violated. For these reasons, it is my Report and Recommendation that the defendant's motion to suppress his statements be **denied**.

### Conclusion

For the foregoing reasons, it is my Report and Recommendation that the defendant's motion to suppress statements be **denied** and his motion to suppress evidence be **granted** unless the government provides further legal and factual support for its "alternative argument" in accordance with the briefing schedule as set forth in this Report and Recommendation.

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     June 3, 2019
           Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:    June 3, 2019
         Rochester, New York

---

[1] The parties are advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).